IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| ACCORDIUS HEALTH LLC, THE CITADEL SALISBURY LLC d/b/a The Citadel Salisbury, THE PORTOPICCOLO GROUP LLC, SIMCHA HYMAN, NAFTALI ZANZIPER, and KIMBERLY MORROW, <br><br> Plaintiffs, <br><br> v. <br><br> THOMAS DEL MARSHALL, by and through Attorney-in-Fact MELISSA STIREWALT, and ROBERT LEROY WHITLATCH, by and through Attorney-in-Fact LORETTA HAIR, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) 1:20cv464 |

### MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, Chief District Judge.

Plaintiffs filed this action to compel arbitration of Defendants' state court lawsuit against them for alleged violations of the North Carolina Patient's Bill of Rights in the wake of the COVID-19 pandemic. (Doc. 1 ¶ 18.) Before the court are the motion to compel arbitration and stay proceedings by Plaintiffs Accordius Health LLC, the Citadel Salisbury LLC, the Portopiccolo Group LLC, Simcha Hyman, Naftali Zanziper, and Kimberly Marrow ("arbitration motion") (Doc. 13); the motion for limited discovery by Defendants Thomas Del Marshall and Robert Leroy Whitlach, by and through their respective attorneys-in-fact, Melissa Stirewalt and Loretta Hair (Doc. 21); the motion to strike

by Plaintiffs (Doc. 24); the motion to seal by Plaintiffs (Doc. 15); and the motion for leave to file surreply by Defendants (Doc. 36). For the reasons set forth below, Plaintiffs' arbitration motion will be denied, Defendants' motion for limited discovery will be granted, Plaintiffs' motion to strike will be denied, and Plaintiffs' motion to seal will be granted.

## I. BACKGROUND

The basic facts alleged, as relevant to the motions before the court, are as follows:

Defendants Marshall and Whitlatch are residents of a nursing home facility located at 710 Julian Road. (Doc. 19 at 2.) When each Defendant entered the facility in 2019, it was known as Salisbury Center and was operated by 710 Julian Road Operations LLC, a provider affiliated with the Genesis Healthcare enterprise. (Id. at 2-3.)

On March 27, 2019, Marshall executed a notarized power of attorney designating his daughters, Stirewalt and Amanda Marshall Dykeman, as his agents. (Doc. 20-2 at 47–50.) On April 22, 2019, Marshall was admitted to Salisbury Center. (Doc. 19 at 4.) Upon entry, he was given and signed numerous admission-related documents, including a standalone arbitration agreement ("2019 arbitration agreement"). (Id.) The 2019 arbitration agreement, which was not a condition of admission, mandates that all claims or controversies relating to the patient's stay be submitted to

2

arbitration pursuant to the Federal Arbitration Act. (Doc. 1-1 ¶¶ 2, 3, 19.) It further provides that the agreement "shall inure to the direct benefit of and bind [Salisbury] Center, its . . . successors, [and] assigns." (Id. ¶ 15.) It bears the signature of Marshall on his own behalf and Erica Dalton on behalf of Salisbury Center. (Id. at 4.) Marshall was later diagnosed with dementia. (Doc. 20-8 at 5.)

On August 23, 2019, Whitlatch was admitted to Salisbury Center. (Doc. 19 at 7.) Upon his admission, Hair, on behalf of Whitlatch as his power of attorney, signed the same admission-related documents as those allegedly signed by Marshall, including an identical 2019 arbitration agreement. (See Doc. 1-2.)

On February 1, 2020, Salisbury Center was sold and operational control was transferred from 710 Julian Road Operations to The Citadel Salisbury LLC ("Citadel"). (Doc. 19 at 3; see Docs. 14-6, 16.) The Transfer Agreement effecting the sale indicated that "[w]ith respect to the occupancy, residency, tenancy and similar written agreements entered into in the ordinary course of business with residents . . . (collectively, the 'Resident Agreements')," Citadel shall accept assignment, "subject to the representation . . . that none of such Resident Agreements (i) deviate[s] in any material respect from the standard form of resident agreement provided by [710 Julian Road Operations]." (Doc. 16 ¶ 2.14(a).) The parties also executed a separate Assumption and Assignment

3

Agreement, which provided that on January 31, 2020, 710 Julian Road Operations "assign[ed], convey[ed] and transfer[red] to [Citadel], all of [710 Julian Road Operations'] right, title and interest under the Resident Agreements in effect" on that date. (Doc. 14-6 at 1.) Following the transfer, the facility was renamed "The Citadel at Salisbury." (Doc. 19 at 3.)

On April 28, 2020, Defendants filed suit against Plaintiffs in the General Court of Justice, Superior Court Division, of Rowan County, North Carolina for violations of the North Carolina Patient's Bill of Rights. (Doc. 1 ¶ 18.)

On May 19, 2020, Dalton — now employed by Citadel — sent an email to the residents and families of residents of The Citadel at Salisbury asking them to complete and sign a new contract (the "2020 contract"), which included an arbitration clause. (Doc. 22 at 8.)

On May 26, 2020, Plaintiffs initiated this action to compel arbitration and stay the state court proceedings against them. (Doc. 1.)

On June 11, 2020, Hair, on behalf of Whitlatch, completed and signed the 2020 contract but declined the arbitration clause. (Doc. 20-1 at 16–17, 19.) The next day, Stirewalt, on behalf of Marshall, completed and signed the 2020 contract but also declined the arbitration clause. (Doc. 20-2 at 35–36, 38.)

On July 6, 2020, Plaintiffs filed the present motion to compel

4

arbitration. (Doc. 13.) Defendants responded in opposition (Doc. 19), and Plaintiffs replied (Doc. 28). Defendants also filed a cross-motion to allow limited discovery on the issue of arbitrability, accompanied by over 30 exhibits. (Docs. 21, 20.) Plaintiffs subsequently moved to strike multiple exhibits included with Defendants' cross-motion. (Doc. 24.) Plaintiffs have also moved to seal a copy of the Transfer Agreement (Docs. 14-4, 16). (Doc. 15.) Though all motions were fully briefed (Docs. 30-33), it was unclear whether Plaintiffs maintained that the 2020 contracts were executed. So, the court directed Plaintiffs to indicate their position, including the date those agreements allegedly became effective, if ever. (Doc. 34.) In response, Plaintiffs stated their position that the 2020 contracts were not executed and have not entered into force. (Doc. 35.) In reaction to Plaintiffs' filing, Defendants moved for leave to file a response to contest positions newly expressed by Plaintiffs, along with prior correspondence between the parties. (Docs. 36, 37.) On this state of the record, the motions are ready for resolution.

## II. ANALYSIS

### A. Legal Standard

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16, establishes "a liberal federal policy favoring arbitration agreements." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983). Thus, "any doubts concerning the scope of

arbitrable issues should be resolved in favor of arbitration." Id. at 24–25. As "agreements to arbitrate must be enforced," Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985), "courts may compel arbitration where a party has failed to abide by a valid arbitration clause," Dillon v. BMO Harris Bank, N.A., No. 1:13-CV-897, 2014 WL 911950, at *1 (M.D.N.C. Mar. 10, 2014). However, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Am. Bankers Ins. Grp. v. Long, 453 F.3d 623, 626–27 (4th Cir. 2006). As such, prior to submitting a dispute to arbitration, a court must make two threshold determinations. First, the court must determine whether parties have a valid and enforceable agreement to arbitrate. Berkeley Cnty. Sch. Dist. v. Hub Int'l Ltd., 944 F.3d 225, 234 (4th Cir. 2019). This inquiry is not confined to defects in contract formation, but also includes "such grounds as exist at law or in equity for the revocation of any contract." Hooters of Am., Inc. v. Phillips, 173 F.3d 933, 938 (4th Cir. 1999). In conducting this inquiry, courts apply the contract formation and interpretation principles of the forum state. Arthur Anderson LLP v. Carlisle, 556 U.S. 624, 630–31 (2009); see also Cara's Notions v. Hallmark Cards, Inc., 140 F.3d 566, 569 (4th Cir. 1998). Second, if the court concludes that there is a valid agreement to arbitrate, the court must then determine whether "the specific

6

dispute falls within the substantive scope of that agreement." Phillips, 173 F.3d at 938.

The standard for deciding a motion to compel arbitration is similar to that applied to a motion for summary judgment. Berkeley, 944 F.3d at 234; Adams v. Citicorp Credit Servs., Inc., 93 F. Supp. 3d 441, 445 (M.D.N.C. 2015). A party seeking to compel arbitration bears the initial burden of demonstrating the absence of any genuine issue of material fact as to the parties' agreement to arbitrate. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Noe v. City Nat'l Bank of W. Va., 828 F. App'x 163, 166 (4th Cir. 2020). Once the moving party has met its burden, the nonmoving party must affirmatively demonstrate with specific evidence that there is a genuine dispute of material fact requiring trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986); see Drews Distrib., Inc. v. Silicon Gaming, Inc., 245 F.3d 347, 352 n.3 (4th Cir. 2001). In determining whether arbitration should be compelled, the court is entitled to consider materials beyond the complaint and its supporting documents. Berkeley, 944 F.3d at 234.

**B.  Agreement to Arbitrate**

Plaintiffs move to compel arbitration based on the 2019 arbitration agreements between Defendants and 710 Julian Road Operations. Plaintiffs maintain that as assignees of these agreements, they are entitled to enforce the arbitration

7

agreements against Defendants. In response, Defendants argue multiple grounds, which can be distilled into three broad contentions, as to why Plaintiffs cannot enforce the 2019 arbitration agreements against them. First, Defendants contend that the 2019 arbitration agreements are not controlling for the present dispute because they were superseded by the 2020 contracts that do not contain agreed-to arbitration provisions. Second, Defendants argue that, even if the 2019 arbitration agreements were not superseded, they were not properly assigned to Citadel. Third, Marshall argues that he did not consent to the 2019 arbitration agreement. Each claim will be addressed in turn.

### 1. Controlling Agreement

Defendants initially argue that the 2019 arbitration agreements do not apply to the present action. First, Defendants contend that the 2019 arbitration agreements were superseded by the 2020 contracts in which both Marshall and Whitlatch, through their attorneys-in-fact, declined the arbitration clauses.[1] Second, Defendants argue that because their state court action seeks solely injunctive relief, only the 2020 contracts are relevant. Each claim is addressed in turn.

### a. Superseding agreement

---

[1] To the extent Plaintiffs object to the court's consideration of the 2020 contracts on the ground of relevance (see Doc. 25 at 3), that objection is addressed in Section II.C., infra.

"Under North Carolina law, '[w]hether a new contract between the same parties discharges or supersedes a prior agreement between them depends upon their intention[s] as ascertained from the instrument[s].'" Dasher v. RBC Bank (USA), 745 F.3d 1111, 1116 (11th Cir. 2014) (quoting Penney v. Carpenter, 231 S.E.2d 171, 173 (N.C. Ct. App. 1977)) (alterations in original). If the parties do not expressly indicate whether a new contract is being made, courts will look to the words of the contract to determine whether the second contract supersedes the first. Whittaker Gen. Med. Corp. v. Daniel, 379 S.E.2d 824, 827 (N.C. 1989). The presence of a merger clause in a subsequent contract "create[s] a rebuttable presumption that the writing represents the final agreement between the parties" such that a supersession occurs. Med. Staffing Network, Inc. v. Ridgway, 670 S.E.2d 321, 326 (N.C. Ct. App. 2009). Where the words of the contract do not make it clear, the court may also look to the circumstances surrounding the second contract. Daniel, 379 S.E.2d at 827. "If the second contract deals with the subject matter of the first so comprehensively as to be complete within itself or if the two contracts are so inconsistent that the two cannot stand together, a novation occurs." Id.

Here, Marshall and Whitlatch entered into the 2019 arbitration agreements on April 22, 2019 and August 23, 2019, respectively. The agreements contain a merger clause stating that

9

the written contract "contains the entire agreement between the
parties with respect to arbitration and no prior, concurrent, or
subsequent oral or written representations or agreements shall be
of any force or effect, unless made in writing and signed by the
parties." As the 2020 contracts are in writing, and if all parties
properly signed the 2020 contracts, the 2020 contracts would comply
with, and thus supersede, the terms of 2019 arbitration agreements.
This conclusion is supported by the merger clause within the 2020
contract itself which states, "This Agreement . . . is a complete
Agreement . . . between the facility, Resident and Sponsor." A
review of the arbitration clause within the 2020 contracts —
although purportedly rejected by Defendants — lends additional
support to the finding of a supersession. This clause provides a
detailed mechanism for resolving disputes through arbitration and
incorporates by reference the arbitration rules and procedures of
JAMS. These rules and procedures are sufficiently comprehensive
to constitute a complete agreement.[2]

---

[2] To the extent Defendants argue, and Plaintiffs contest, that the 2020
contracts, if executed, apply retroactively, the court finds no support
for these claims. Although it is not clear from Defendants' briefings
that they intend to argue that the 2020 contracts apply retroactively,
Plaintiffs seem to contest it. (See Doc. 28 at 2-3.) Plaintiffs cite
to Dasher, 745 F.3d 1111, but this case is clearly distinguishable. In
Dasher, the Eleventh Circuit, applying North Carolina law, determined
that a subsequent agreement superseded an original agreement and applied
retroactively where the original agreement contained an amendment clause
that stated, "the most current version of the Agreement supersedes all
prior versions and will at all times govern." Id. at 1117. Based on
the phrase "at all times," the court held that the subsequent agreement
applied retroactively. Id. at 1124. As a result, the subsequent

10

As discussed in Section II.1.b., _infra_, however, it is not clear on the present record that the 2020 contracts have been signed by Plaintiffs. Plaintiffs maintain that the 2020 contracts have not been executed, and the copies of the 2020 contracts Defendants submitted contain only their signatures. Therefore, while the court finds that the 2020 contracts can apply from the date both parties signed them, as required by the 2019 arbitration agreements, it remains to be demonstrated whether the 2020 contracts were fully executed.[3]

### b.    Governing agreement

Because the court has determined that the 2019 arbitration agreements could be superseded by the 2020 contracts, the court must address whether proof that the 2020 contracts were executed

---

agreement — which did not contain an arbitration clause — governed the parties' dispute and the court could not compel arbitration, despite the facts underlying the dispute having occurred before the subsequent agreement went into effect. _Id._ Here, the 2019 arbitration agreements contain no language similar to that in _Dasher_. The 2019 agreements explicitly provide that a subsequent agreement must be in writing and signed by the parties, and they contain no language indicating that a superseding agreement would be retroactive. Moreover, the 2020 contracts themselves contain no language indicating that they would apply retroactively. As such, given that the parties did not sign the superseding agreement until June 2020 at the earliest, the agreements could not be effective at least until that time. To the extent Defendants contend that the 2020 contracts govern the present dispute regardless of retroactivity, that argument is addressed in Section II.1.b., _infra_.

[3] Defendants set out several arguments to rebut Plaintiffs' contention that they never accepted the 2020 contracts once Defendants struck the arbitration provisions. (Docs. 36, 37.) Because these raise potentially disputed issues, the court finds it unnecessary to consider Defendants' briefing and materials at this time, and Defendants' motion for leave to file a surreply (Doc. 36) will be denied without prejudice to raising those arguments following limited discovery ordered herein.

11

would matter. That is, could the 2020 contracts govern the current dispute?

Defendants argue that only the 2020 contracts should apply to its underlying action in state court. If these contracts were executed, this argument is persuasive. Defendants' underlying suit is not based on violations of a preexisting contractual agreement, but rather upon Plaintiffs' alleged violations of its statutory duties under the North Carolina Patients' Bill of Rights. (See Doc. 31-1.) Importantly, Defendants seek purely injunctive relief. Injunctive relief, a necessarily forward-looking remedy, "must address the continuing, present adverse effects of an alleged injury." Chapman v. CKE Rests. Holdings, Inc., No. 5:19-CV-189-D, 2020 WL 1230130, at *6 (E.D.N.C. Mar. 12, 2020). As Defendants attempt to address current and ongoing statutory violations, the contract that currently governs the relationship between the parties — and arbitrability of disputes arising from that relationship — would control.

But as noted, it remains unclear whether all parties have executed the 2020 contracts. Defendants maintain that the 2020 contracts were signed and executed in June 2020.[4] (See Doc. 19 at 13.) Plaintiffs, conversely, assert that the 2020 contracts were

---

[4] Although Defendants have provided copies of the relevant agreements, these copies bear only their own signatures. (See Docs. 20-1, 20-2.)

12

never executed.   (Doc. 35.)   They allege that Defendants, in striking out the arbitration clause in the 2020 contracts, merely made a counteroffer to Plaintiffs that Plaintiffs rejected.[5]   (Id. at 2.)   On the record before it, this remains a disputed issue preventing the court from determining which agreement governs the current dispute.   As such, the court will order additional discovery, limited to the issues of whether the 2020 contract was fully executed and, if so, its effective date.

### 2.   Assignment of the 2019 arbitration agreement

#### a.   Assignment to Citadel

Defendants next argue that even if the 2020 contracts were not executed and the 2019 arbitration agreements remain in effect, Plaintiffs cannot enforce the latter against them because "[n]one of the movants are contracting parties.   They are non-signatories to the [2019] arbitration agreement[s]."   (Doc. 19 at 11.)   In response, Plaintiffs argue that Citadel is empowered to enforce the 2019 arbitration agreements because the agreements were assigned to it by 710 Julian Road Operations in the transfer of

---

[5] Plaintiffs' claimed rejection of the 2020 contracts on the ground that the arbitration clauses were struck and thus constituted a counteroffer is, to say the least, in tension with a 2019 federal regulation which states that skilled nursing facilities must "not require any resident or his or her representative to sign an agreement for binding arbitration as a condition of admission to, or as a requirement to continue to receive care at, the facility."   See 42 C.F.R. § 483.70(n).   It may be that Plaintiffs are treading on thin ice here.   Whether their position can prevail, and any factual support for it, will have to be resolved following limited discovery.

13

Salisbury Center.[6]  (Doc. 28 at 4.)  Defendants reply that Citadel
is not an assignee of the 2019 arbitration agreements because the
language used in the Transfer Agreement is ambiguous and does not
clearly include the arbitration agreements.

Whether a contract is ambiguous is a question of law.  See
Morell v. Hardin Creek, Inc., 821 S.E.2d 360, 366 (N.C. 2018).
"An ambiguity exists in a contract when either the meaning of words
or the effect of provisions is uncertain or capable of several
reasonable interpretations."  Register v. White, 599 S.E.2d 549,
553 (N.C. 2004).  In relation to an assignment under North Carolina
law, "a valid assignment 'must designate the assignor, the
assignee, and the thing assigned.'"  Erichsen v. RBC Capital
Markets, LLC, 883 F. Supp. 2d 562, 570 (E.D.N.C. 2012) (quoting
Morton v. Thornton, 131 S.E.2d 378, 380 (N.C. 1963)).

Here, the Transfer Agreement clearly indicates both the
assignor — identifying 710 Julian Road Operations LLC as the

---

[6] To the extent Defendants argue that the 2019 arbitration agreements
are not assignable absent Defendants' consent, this argument is
unavailing.  The 2019 arbitration agreements clearly contemplate the
possibility of assignment and do not require the consent of any party
prior to assignment.  (See Doc. 1-1 ¶ 15 ("It is the parties' intention
that this Agreement shall inure to the direct benefit and bind the
Center, . . . [its] successors, [and] assigns.").)  Although Defendants
characterize the 2019 arbitration agreements as contracts involving
personal skill for which Defendants' consent to assignment would be
required, this is inaccurate.  Even assuming the services that Salisbury
Center agreed to provide involve personal skill such that the assignment
of the service contracts required Defendants' consent, the 2019
arbitration agreements are stand-alone agreements that do not involve
personal skill.  Arbitration agreements are assignable.  See, e.g.,
Erichsen v. RBC Capital Markets, LLC, 883 F. Supp. 2d 562, 570 (E.D.N.C.
2012).

14

"Existing Operator" — and the assignee — identifying The Citadel Salisbury LLC as the "New Operator." (Doc. 16 at 1.) The issue is whether the Transfer Agreement sufficiently identifies "the thing assigned" such that the court can determine whether the 2019 arbitration agreements were validly assigned to Citadel.

The Transfer Agreement indicates that 710 Julian Road Operations assigned to Citadel "the occupancy, residency, tenancy and similar written agreements entered into in the ordinary course of business with residents . . . (collectively, the 'Resident Agreements')." (Id. ¶ 2.14(a).) Plaintiffs argue that this language is not ambiguous because the arbitration agreement is "certainly [] a 'written agreement entered into in the ordinary course of business with residents.'" (Doc. 28 at 7.) However, as the text of the agreement mandates, in addition to being a written agreement entered into with residents in the ordinary course business, the arbitration agreement must also be similar to "the occupancy, residency, [or] tenancy" agreements. Defendants correctly point out that none of the agreements that 710 Julian Road Operations routinely entered into with residents was called "occupancy agreement," "residency agreement," "tenancy agreement," or "Resident Agreement." (See Doc. 1-7.) Based on the text of the Transfer Agreement alone, and considering the number of documents signed by Defendants upon entry to Salisbury Center, it is unclear which documents would fall within the assigned Resident

15

Agreements.  The documents range from "Room and Service Price List" to "Consent for Treatment" and "Salon Request Form."  Although the Transfer Agreement indicates that 710 Julian Road Operations was to provide Citadel with a "standard form of resident agreement," (Doc. 16 ¶ 2.14(a)) — a document which may have illuminated the agreements that the parties intended to include in the assignment — this document has not been provided, or even located, by either Citadel or Genesis, 710 Julian Road Operation's parent company. (Doc. 19 at 20.)  Thus, the court cannot determine on this record that the arbitration agreements are sufficiently similar to the occupancy, residency, or tenancy agreements to constitute part of the assigned Resident Agreements.

Because the language of the Transfer Agreement is ambiguous regarding the assignment of the 2019 arbitration agreements, the court cannot determine whether the 2019 arbitration agreements were validly assigned to Citadel.  Therefore, the court will direct the Magistrate Judge to order limited discovery as to whether the 2019 arbitration agreements were included in the "Resident Agreements" assigned to Citadel in the Transfer Agreement with 710 Julian Road Operations.  See also Hinshaw v. Wright, 412 S.E.2d 138, 164 (N.C. Ct. App. 1992) ("[T]he parol evidence rule allows for evidence which explains ambiguous terms in the contract.").

**b.  Assignment to Citadel's affiliates**

16

Defendants argue that even if the 2019 arbitration agreements were properly assigned to Citadel, the remaining Plaintiffs are unable to invoke these agreements to compel arbitration because the agreements do not indicate that they apply to an assignee's affiliates, management companies, employees, officers, or other relevant third parties. (Doc. 19 at 16.) In response, Citadel argues that they "stand in the shoes" of 710 Julian Road Operations, such that Citadel's affiliates receive the same rights and benefits under the 2019 arbitration agreements as would those of 710 Julian Road Operations. (Doc. 28 at 5.)

In determining the scope of an arbitration agreement, courts apply the ordinary state-law principles that govern the interpretation of contracts. See Erichsen, 883 F. Supp. 2d at 569; Allen v. SSC Lexington Operating Co. LLC, No. 1:16CV1080, 2017 WL 4357449, at *3 (M.D.N.C. Sept. 29, 2017). Under North Carolina law, an assignee of rights is considered to "step[] into the shoes of the assignor with regard to the matters covered by the assignment." Skinner v. Preferred Credit, 616 S.E.2d 676, 680 (N.C. Ct. App. 2005), aff'd, 638 S.E.2d 203 (N.C. 2006) (internal citations omitted). "It has long been the law in North Carolina that 'the assignee stands absolutely in the place of his assignor, and it is . . . as if the contract had been originally made with the assignee, upon precisely the same terms as with the original parties.'" Credigy Receivables, Inc. v. Whittington, 689 S.E.2d

17

889, 893 (N.C. Ct. App.), disc. rev. denied, 700 S.E.2d 748, 749
(N.C. 2010) (quoting Smith v. Brittain, 38 N.C. 347, 354 (1844))
(alterations in original).

Here, the 2019 arbitration agreements provide that they
"inure to the direct benefit of and bind [710 Julian Road
Operations], its direct and indirect parent companies, affiliates,
direct and indirect subsidiary companies, owners, landlords,
administrative service providers, management companies, officers,
directors, medical directors, employees, successors, assigns and
agents."  (See Doc. 1-2 at 4.)  Defendants correctly point out
that this language does not specify that the agreement will apply
to the affiliated third parties of an assignee.  However, as
Citadel steps into the shoes of 710 Julian Road Operations, this
language is not strictly necessary.  The Assumption and Assignment
Agreement between 710 Julian Road Operations and Citadel expressly
provides that 710 Julian Road Operations assigned, conveyed, and
transferred, "all of [its] right, title and interest under the
Resident Agreements."  (Doc. 14-6 at 2.)  If the assignment of the
Resident Agreements includes the 2019 arbitration agreements,
Citadel would have all of the rights granted to 710 Julian Road
Operations in those agreements as though they were originally made
with Citadel.  As such, Citadel would be able to invoke the 2019
arbitration agreements on the same terms upon which 710 Julian
Road Operations would have been able to invoke them.  As relevant

18

here, those terms would enable Citadel to invoke the agreements and compel arbitration on behalf its affiliates, management companies, employees, officers, and other specified third parties in the same manner that 710 Julian Road Operations would have been able so to do.

Accordingly, if it is determined that the assignment to Citadel properly included the 2019 arbitration agreements such that Citadel can compel arbitration thereunder, Citadel can also compel arbitration in relation to the claims covered by those agreements against Citadel's affiliated third parties as specified by the agreements. Defendants, however, contest whether the remaining Plaintiffs are within the specified third parties described by those agreements. (Doc. 22 at 15.) In response, Citadel provided proof, by way of affidavit of Simcha Hyman, regarding its relations with the remaining Plaintiffs and how it believes those Plaintiffs fit within the third parties defined by the 2019 arbitration agreements. (Doc. 28-3.) Therefore, there does not appear to be a genuine dispute as to this issue. However, because Plaintiffs filed their affidavit with their reply brief, Defendants have not had an opportunity to respond. Should Defendants make a showing of need, the Magistrate Judge may consider ordering limited discovery as to whether Plaintiffs Accordius Health LLC, the Portopiccolo Group LLC, Simcha Hyman, Naftali Zanziper, and Kimberly Morrow constitute direct or

indirect parent companies, affiliates, direct or indirect subsidiary companies, owners, landlords, administrative service providers, management companies, officers, directors, medical directors, employees, successors, assigns, or agents of Citadel within the meaning of the 2019 arbitration agreements.

### 3. Marshall's consent to the 2019 agreement

Finally, Marshall argues that even if the 2019 arbitration agreement was properly assigned to Citadel, Plaintiffs have not established that he signed that agreement.[7]

As the standard of review on a motion to compel arbitration is "akin to the burden on summary judgment," Galloway v. Santander Consumer USA, Inc., 819 F.3d 79, 85 n.3 (4th Cir. 2016) (quoting Chorley Enters. v. Dickey's Barbecue Rests., Inc., 807 F.3d 553, 564 (4th Cir. 2015)), a party seeking to compel arbitration "bears the initial responsibility of . . . identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact," Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see Noe, 828 F. App'x at 166. The non-moving party must then "set forth specific facts showing that there is a genuine issue for trial." Matsushita, 475 U.S. at 586-87; see Noe, 828 F. App'x at 166. "The nonmoving party may

---

[7] Marshall also suggests that he did not knowingly consent to the agreement. (See Doc. 19 at 15.) However, he has failed to make any argument supporting this claim, and the court need not consider it.

not simply rest on her pleadings or on conclusory allegations but must 'set forth specific facts.' . . . [O]nly facts that would be admissible at trial may" satisfy this burden.  <u>Felton v. Felton</u>, 181 F.3d 87, 1999 WL 381814, at *2 (4th Cir. 1999) (internal citations omitted); <u>see</u> <u>Chorley</u>, 807 F.3d at 564; <u>see also</u> Fed. R. Civ. P. 56(c)(4) (requiring that affidavits submitted in support of or in opposition to summary judgment relate admissible evidence).  Where the nonmoving party has produced no admissible evidence as a counterweight to the moving party's evidence, that party has not met its burden to "set forth specific facts showing that there is a genuine issue for trial." <u>Matsushita</u>, 475 U.S. at 586–87; <u>see</u> <u>Erichsen</u>, 883 F. Supp. 2d at 567; Fed. R. Civ. P. 56(e)(2) (permitting the court to consider a fact undisputed if the opposing party fails to properly address the other party's assertion of fact).

Marshall maintains that there is a genuine dispute regarding his consent to the 2019 arbitration agreement based on the affidavit of Stirewalt, his power of attorney and daughter.  In her affidavit, Stirewalt states that the signatures on Marshall's admissions paperwork "do not all look like they are really his own handwriting, to me."  (Doc. 20-2 at 2.)  In response, Plaintiffs argue that Stirewalt's affidavit, and the statement regarding Marshall's signature in particular, are not admissible and therefore cannot be relied upon to create a genuine dispute of

21

fact. Plaintiffs have also submitted an affidavit from Dalton indicating that she "specifically recall[s] that Mr. Marshall signed this paperwork and that the signatures reflected are in fact his signature." (Doc. 27-2 ¶ 6.) At the present stage, to determine whether Marshall has raised a genuine dispute of fact regarding the authenticity of his signature, the court must first determine whether Stirewalt's statement — the only evidence Defendants offer on this issue — would be admissible as evidence at trial.[8]

Federal Rule of Evidence 701 governs lay witness opinion testimony and dictates that such testimony must meet three requirements, one of which is relevant here: the testimony must be "rationally based on the perception of the witness." Fed. R. Evid. 701(a). Rule 901(b)(2) is a more specific rule, governing lay witness opinion testimony as it relates to the identification of handwriting. This rule requires that "[n]on-expert opinion as to the genuineness of handwriting [be] based upon familiarity not acquired for purposes of the litigation." Fed. R. Evid. 901(b)(2). Under this rule, a non-expert opinion must provide "a minimal factual basis from which knowledge of, and a familiarity with, another's handwriting might reasonably have been acquired, in the

---

[8] Defendants have not sought to ask Marshall himself about the authenticity of his signature. (Doc. 19 at 5.) Whether this is because of his dementia is not stated, though it is noteworthy that Stirewalt's affidavit reports multiple conversations with her father that require his recall.

absence of which the opinion evidence may be properly excluded." United States v. Binzel, 907 F.2d 746, 749 (7th Cir. 1990) (internal citations excluded). Although the Fourth Circuit has not had occasion to review these rules in conjunction, other circuits have concluded that testimony purporting to satisfy the specific requirements of Rule 901(b)(2) must also satisfy the general requirements of Rule 701. See United States v. Harris, 786 F.3d 443, 447 (6th Cir. 2015); United States v. Ali, 616 F.3d 745, 754 (8th Cir. 2010); United States v. Samet, 466 F.3d 251, 256 (2d Cir. 2006); Hall v. United Ins. Co. of Am., 367 F.3d 1255, 1259 (11th Cir. 2004); United States v. Scott, 270 F.3d 30, 49 (1st Cir. 2001); Binzel, 907 F.2d at 749. As such, if either rule is not satisfied, the testimony is inadmissible.

Here, Stirewalt's affidavit lacks sufficient foundation for her opinion. Stirewalt never states that she is familiar with Marshall's signature, nor does she explain how she became familiar with it or for how long. Instead, Defendants assume that Stirewalt, as Marshall's daughter, is familiar with his handwriting, as it is implied in her statement that the signatures on the intake documents "do not all look like they are really his own handwriting, to me." (Doc. 20-2 at 2.) Stirewalt may very well be able to lay a foundation for her opinion, but her implication, accompanied only by her familial relationship, is insufficient to support her knowledge of his handwriting. Further,

her affidavit does not directly address Marshall's signature on the 2019 arbitration agreement, but rather speaks collectively about "those documents" that "he signed on 4/22/19." (Id.) Even then, she only disputes whether they "all" look like his signature. (Id.) This fails to raise a dispute of material fact on this issue.

Defendants argue that additional discovery on this issue is warranted. They contend that the Dalton affidavit, which affirms that Marshall signed the 2019 arbitration agreement, should not bar additional discovery because genuine questions have been raised regarding Dalton's credibility. Defendants rely on the affidavit of Liza Kluttz, whose father-in-law was a resident of The Citadel at Salisbury. (See Doc. 20-10.) Kluttz reports that her electronic signature was improperly imported from a one-page contract into multiple agreements within the 2020 contract that she had never seen and to which she never agreed. (Id. at 5-6.) But these events involve a different situation entirely from those relating to Marshall's signature. Defendants contest the authenticity of Marshall's signature on the 2019 arbitration agreement, which was allegedly witnessed by Dalton and signed while the facility was run by 710 Julian Road Operations in April 2019. Kluttz's allegations concern the authenticity of her signature on the 2020 contract, allegedly witnessed by Jordan Boone and signed after Citadel took over the facility in May 2020. Allegations

24

relating to a different contract, provided by a different operator, witnessed by a different representative, and occurring over a year later, *without more*, do not sufficiently raise questions regarding Dalton's credibility.

Given that the court is ordering limited discovery on certain issues already, the court will direct the Magistrate Judge to permit limited discovery regarding Stirewalt's claim as to the authenticity of Marshall's signature. However, further discovery as to the potential that any Plaintiff handled Marshall's signature like that of Kluttz will not be required absent an additional showing satisfactory to the Magistrate Judge that suggests the same practice was in effect at the time of Marshall's signature.

C. **Motion to strike**

Plaintiffs have submitted evidentiary objections together with a request to strike (Doc. 24) certain documents attached as exhibits to Defendants' cross-motion for discovery and Defendants' brief in opposition to Plaintiffs' motion to compel arbitration (see Docs. 19, 20, 21). The motion is general and overinclusive, and the court may deny it on those grounds alone. Further, as the court has not relied on many of the challenged exhibits in the foregoing analysis, Plaintiffs' motion to strike as it relates to those exhibits may be denied as moot. In relation to the exhibits on which the court has relied, the court considered Plaintiffs'

25

evidentiary objections and contentions in its analysis. For clarity, those objections are addressed here.

To the extent Plaintiffs object to the court's consideration of the 2020 contracts (Doc. 20-1) on the ground of relevance (see Doc. 25 at 3), such objections are unpersuasive. As discussed above, Defendants' underlying suit is based upon allegedly ongoing statutory violations of North Carolina Patients' Bill of Rights, for which Defendants seek solely injunctive relief. (Id.) Injunctive relief is a forward-looking remedy that "must address the continuing, present adverse effects of an alleged injury." Chapman, 2020 WL 1230130, at *6. Therefore, the state court's ability to provide injunctive relief to Defendants in their underlying suit will be determined by whichever agreement currently governs the relationship between the parties. Whether the 2019 arbitration agreements were superseded by the 2020 contracts — in which Defendants declined the arbitration provisions — is highly relevant to the present dispute.

Next, to the extent Plaintiffs object to Stirewalt's opinion testimony regarding Marshall's handwriting (Doc. 20-2), the court addressed those objections above and concluded Stirewalt's affidavit both lacked foundation for her opinion and was not sufficiently specific as to the issue of the authenticity of Marshall's signature on the 2019 arbitration agreement. On that basis, the court found the affidavit deficient but, for the reasons

26

noted, will permit Marshall to attempt to address the deficiency. Regarding Plaintiffs' remaining objections to Stirewalt's affidavit, the court did not rely on those portions of the affidavit, and those objections are denied as moot.

To the extent Plaintiffs object to the relevance of Kluttz's affidavit (Doc. 20-10), the court took those objections into account and found the Kluttz affidavit was not sufficiently relevant to the issue of Dalton's credibility. Regarding Plaintiffs' remaining objections to Kluttz's affidavit, as the court did not rely on the affidavit in the above analysis, those objections are denied as moot.

### D.   Motion to seal

Plaintiffs have moved to seal the unredacted Transfer Agreement between 710 Julian Road Operations and Citadel (Docs. 14-4, 16) that was submitted in support of the motion to compel arbitration.   (Doc. 15.)   Plaintiffs have provided a redacted version of the agreement for public view. (Doc. 29-1.)  The motion to seal has been pending since July 6, 2020, and no objection to the motion has been made.  See M.D.N.C. L.R. 5.4(c)(5).

When a party makes a request to seal judicial records, a district court "must comply with certain substantive and procedural requirements." Va. Dep't of State Police v. Washington Post, 386 F.3d 567, 576 (4th Cir. 2004).  Procedurally, the court must (1) give the public notice and a reasonable opportunity to

27

challenge the request to seal; (2) "consider less drastic alternatives to sealing"; and (3) if it decides to seal, make specific findings and state the reasons for its decision to seal over the alternatives. Id. "As to the substance, the district court first must determine the source of the right of access with respect to each document, because only then can it accurately weigh the competing interests at stake." Id. (internal quotation marks and alteration omitted). "While the common law presumption in favor of access attaches to all 'judicial records and documents,' the First Amendment guarantee of access has been extended only to particular judicial records and documents," such as materials filed in connection with a summary judgment motion. Stone v. Univ. of Md. Med. Sys. Corp.[_____], 855 F.2d 178, 180 (4th Cir. 1988) (internal citation omitted). Although the Fourth Circuit has "conclude[d] that the First Amendment guarantee of access should not be extended to documents filed in connection with a motion to dismiss" because "[a] motion to dismiss tests only the facial sufficiency of the complaint [and] a court may not consider any materials outside the pleadings," In re Policy Mgmt. Sys. Corp., 67 F.3d 296, 1995 WL 541623, at *3 (4th Cir. 1995) (unpublished table decision), it is unclear whether the common law or First Amendment right of access applies where, as here, materials are filed in connection with a motion to compel arbitration in which a court may consider evidence outside the complaint, see Evans v.

28

B.F. Perkins Co., 166 F.3d 642, 647 (4th Cir. 1999). See also Erichsen, 883 F. Supp. 2d at 573–74 (applying common law right of access in evaluating a motion to seal documents submitted in support of a motion to compel arbitration); Students for Fair Admissions, Inc. v. Univ. of N.C., No. 1:14CV954, 2018 WL 4688388, at *7 (M.D.N.C. Sept. 29, 2018) (applying First Amendment presumption of public access to motion to dismiss for lack of standing because the court was able to consider materials outside the complaint). Here, even applying the more stringent First Amendment presumption of public access, Defendants have met their burden.

"The burden to overcome a First Amendment right of access rests on the party seeking to restrict access, and that party must present specific reasons in support of its position." Washington Post, 386 F.3d at 575; see Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 15 (1986) ("The First Amendment right of access cannot be overcome by [a] conclusory assertion."). The public's right of access "may be abrogated only in unusual circumstances." Stone, 855 F.2d at 182. Evaluating whether these "unusual circumstances" exist in a particular case is a fact-based inquiry conducted in light of the "specific facts and circumstances" of the case at issue. See Washington Post, 386 F.3d at 579. In a criminal case involving motions and hearings to which the public had a First Amendment right of access, the Fourth Circuit held that the

29

following factors were relevant when balancing the government's interest in secrecy and the public's right to access: "whether the records are sought for improper purposes, such as promoting public scandals or unfairly gaining a business advantage; whether release would enhance the public's understanding of an important historical event; and whether the public has already had access to the information contained in the records." In re Knight Publ'g Co., 743 F.2d 231, 235 (4th Cir. 1984) (citing Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597–608 (1978)); see also, Nixon, 435 U.S. at 598 (noting that public access may be inappropriate for "business information that might harm a litigant's competitive standing"). Numerous district courts in this circuit have applied these factors in civil cases. See, e.g., Adler v. CFA Inst., No. 1:11-CV-1167, 2012 WL 3257822, at *1 (E.D. Va. Aug. 7, 2012); Mitchell v. Smithfield Packing Co., No. 4:08-CV-182-H, 2010 WL 4877054, at *1 (E.D.N.C. Nov. 24, 2010); Tustin v. Motorists Mut. Ins. Co., 668 F. Supp. 2d 755, 759 (N.D.W. Va. 2009); Silicon Knights, Inc. v. Epic Games, Inc., No. 5:07-CV-275-D, 2008 WL 3914463, at *3 (E.D.N.C. Aug. 22, 2008).

The Transfer Agreement sought to be sealed was filed in conjunction with Plaintiffs' motion to compel arbitration. It is relevant and admissible and was available for consideration in connection with the motion. Because the agreement contains confidential information pertaining to businesses not party to the

30

present litigation, the court relied on this document in its foregoing analysis, and the motion to seal is unopposed (see Doc. 23), the court will grant the motion.

### III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that Plaintiffs' motion to compel arbitration and stay proceedings (Doc. 13) is DENIED without prejudice; Defendants' motion for limited discovery (Doc. 21) is GRANTED as set out below; Plaintiffs' motion to strike (Doc. 24) is DENIED; Plaintiffs' motion to seal (Doc. 15) is GRANTED; and Defendants' motion for leave to file surreply (Doc. 36) is DENIED without prejudice.

The court finds that the parties should engage in discovery on the following issues:

1. Whether the 2020 contracts that were signed by Defendants Whitlatch and Marshall's powers of attorney on June 11, 2020 and June 12, 2020, respectively, became operative and, if so, when.

2. Whether the 2019 arbitration agreements entered into by Defendants with Salisbury Center, operated by 710 Julian Road Operations LLC, were included in the assignment of the "Resident Agreements" as defined in the Transfer Agreement between 710 Julian Road Operations and Citadel.

31

3. Should Defendants make a sufficient argument to the Magistrate Judge, whether Plaintiffs Accordius Health LLC, the Portopiccolo Group LLC, Simcha Hyman, Naftali Zanziper, and Kimberly Morrow constitute direct or indirect parent companies, affiliates, direct or indirect subsidiary companies, owners, landlords, administrative service providers, management companies, officers, directors, medical directors, employees, successors, assigns or agents of Citadel within the meaning of the 2019 arbitration agreements.

4. Whether Stirewalt has sufficient foundation for stating a lay opinion as to whether the signature of Marshall on the 2019 arbitration agreement appears similar to his known signature.

5. Any other issue determined by the Magistrate Judge necessarily related to these issues.

The case is referred to the U.S. Magistrate Judge for the determination of a limited discovery schedule so the court can make a final determination about arbitrability.


                                       /s/    Thomas D. Schroeder
                                     United States District Judge

December 30, 2020